### BEAUMONT v. NORTHERN PAC. RY. CO.

(Circuit Court of Appeals, Ninth Circuit. May 6, 1901.)

#### No. 665.

MASTER AND SERVANT—KILLING OF RAILROAD ENGINEER IN COLLISION—NEGLIGENCE OF FELLOW SERVANTS.

Plaintiff's intestate, who was engineer on an extra train on defendant's railroad, consisting of the engine and a caboose, was killed in a collision between his engine and the rear of a work train, which was ahead of him, and was just passing onto a side track at a station. The train orders sent to, and received by, the conductors and engineers of both the work train and extra were proper, and required the work train to protect against the extra. Deceased knew that the work train was ahead of him, and the evidence showed without conflict that he could and should have seen the signal made by a brakeman from the work train when 700 feet distant, within which distance he could have stopped. It also showed that he was running in disregard of an order which required him to run slowly and carefully at the place of collision. Held, that there was no evidence of any negligence on the part of defendant, and that whether the collision occurred through the negligence of deceased, or of the conductor of the work train, who were fellow servants, defendant was not liable for the death.

In Error to the Circuit Court of the United States for the Northern Division of the District of Washington.

J. M. Ashton and W. L. Sachse, for plaintiff in error.

B. S. Grosscup and Chas. S. Fogg, for defendant in error.

Before GILBERT and ROSS, Circuit Judges, and HAWLEY, District Judge.

HAWLEY, District Judge. This is an action brought by the plaintiff in error against the defendant in error to recover damages for the alleged negligent killing of her husband, James Beaumont. At the close of the trial the court directed the jury to find a verdict for the defendant. The jury so found, and judgment was duly rendered in defendant's favor. The only question raised by the assignment of errors is whether or not the court erred in giving this instruction.

The material facts are substantially as follows:

James Beaumont was an engineer, and as such had been employed for several years by the defendant. Shortly after midnight, on the morning of September 29, 1898, George Blew, as conductor, and James Beaumont, as engineer, were ordered by defendant to proceed with a train, consisting of an engine and caboose only, to the station of Lester, 66 miles east of Tacoma. There were two work trains on the Cascade Division of the railroad of defendant,—one in charge of Johnson, as conductor; the other in charge of Hall, as conductor. Hall's working limits were between Veazie gravel pit, 35 miles east of Tacoma, and Lester. Palmer is 43⁷/₁₀ miles east of Tacoma. Veazie is about 4 miles west of Palmer, and Maywood, near where the accident occurred, is 59²/₁₀ miles east of Tacoma. It appears from the evidence that prior to the accident a work train had plowed off a lot of gravel from flat cars so as to form small ridges on each side of the track at the place of the accident; that immediately after Beaumont had applied the emergency air brakes to his engine he either jumped or was thrown out of the cab in his engine, and in alighting jumped or fell onto one of the ridges of the gravel, above referred to, and, rolling onto the track, the caboose attached to his engine ran over and killed him.

The following telegraphic train orders were issued by defendant's train dispatcher: "Tacoma, September 29, 1898. Order No. 5. Blew will run extra, Meeker to South Prairie, with right of track against No. 53. Second section of No. 57 and Blew extra east will meet at Crocker." This order was received by Beaumont at Meeker at 12:55 a. m. "Train Order No. 10. For So. Prairie. To Blew and Engineer Extra East, for Palmer, to Hall and Engineer: Blew will run extra, So. Prairie to Lester, and second section No. 53 and Blew extra east will meet at Enumclaw. Johnson and Hall, two (2) work trains between Enumclaw and Lester, will protect against Blew extra east after three fifteen (3:15) a. m." This order was received by conductor Blew and Engineer Beaumont at South Prairie at 2:55 a. m., and by Hall, conductor of the work train, at Palmer, at 2:54 a. m., September 29, 1898.

Defendant's rule 201 provides that "each order must be given in the same words to all persons or trains directly affected by it, so that each shall have a duplicate of what is given to the others." Under this rule, the order was sent to Hall, Blew, and Johnson, and their engineers. This rule and practice in sending dispatches was well known to Beaumont. Each conductor and engineer knew that the other conductors and engineers on the road would receive the same dispatch.

"Train Order No. 11, for Veazie Station. To Blew and Engineer, Extra East, for Johnson and Engineer: No. 1 will run one (1) hour and fifteen (15) minutes late from Lester to Enumclaw, and one (1) hour late from Enumclaw to Meeker." This order was received by Beaumont at Veazie, after he had passed second section of No. 53 at Enumclaw. At the same time and place that the conductors and engineers received order No. 10 they received order No. 37, which was promulgated August 26, 1898, as a standing order, and was delivered from day to day to the conductors and engineers of all passing trains. It reads as follows: "To All Concerned: Run slowly and carefully at following points: Over bridge 213, between

mile posts 46 and 47, at Eagle Gorge; between mile posts 54 and 55; and at Maywood, where track changes are being made. * * *"

The following, among other, transportation rules of the defendant were introduced in evidence:

"Rule 41. Bulletins will be kept at all registering stations, and additions to same must invariably be timed. Engineers and conductors must inspect them thoroughly before departing on their runs."

"Rule 53. Each train, while running, must display two green flags by day, and two green lights by night, one on each side of the rear car of the train, as markers to indicate the rear of the train. * * *"

"Rule 110. All trains are designated as regular or extra. Regular trains are those represented on the time-table, and may consist of one or more sections. All sections of a train, except the last, must display signals as provided in rule 56. Extra trains are those not represented on the time-table. An engine, without cars, in service on the road, shall be considered a train. (See rule 57.)"

"Rule 112. Irregular trains will be distinguished as follows: If passenger, special; if freight, extra; if for work, work trains."

"Rule 133. When a train is stopped by an accident or obstruction, the rear brakeman must immediately go back with danger signals to stop any train moving in the same direction. At a point fifteen telegraph poles from the rear of his train he must place one torpedo on the rail. He must then go back at least thirty telegraph poles from the rear of his train and place two torpedoes on the rail, ten yards apart. * * *

"Rule 134. When a flagman is sent out to signal any approaching train, he must, if possible, avoid stopping on a curve or behind any obstruction, endeavoring to pass beyond the same, should such exist, and reach a position where he can be clearly seen from the approaching train for at least one-fourth of a mile. The conductor must know that his train is fully protected in both directions, and he will be held responsible if any accident occurs from want of any precaution that could have been taken."

"Rule 149. The maximum rate of speed for passenger trains is one and a half (1½) minutes to the mile; freight trains, three (3) minutes to the mile, except as provided in special orders."

In addition to the rules, the following testimony was given at the trial, viz.:

Hall, conductor of the work train, testified, on behalf of plaintiff, that he had 25 cars, each car being 41 feet long. That he "had no caboose on work train at Maywood when collision occurred. Passed second section of train No. 53, the through west-bound freight train, at Palmer, at 3:15 a. m., September 29, 1898. Second section of No. 53 was standing at Palmer when I left. We left Palmer at 3:35. Arrived at Maywood at 4:50. Accident happened at 4:50. Intended to go into Maywood siding for No. 1, the regular through west-bound passenger train. Engine and three and one-half cars of my train were inside of siding when the collision occurred. I was about middle of work train when collision took place. Did not send out flagman at Eagle Gorge, the next station west of Maywood and about eight miles east of Palmer. I was familiar with the time-tables, and knew the time required for trains running on that part of the road in either direction. * * * Could not tell from order No. 10 that Beaumont's train was an engine and caboose. Order No. 10 implied that it was an extra freight train. One way of protecting is to run away from the train you are to protect against; that is, keep ahead of it,—keep out of the way by running away from it. * * * There were several green lights on right side of track before reaching curve at Maywood. They are called slow flags. One of these lights was about five hundred feet west of curve, one near point of curve, and one near point of collision. Understood Beaumont was following me. Understood I was to protect against Beaumont. * * * Think lanterns on rear of work train would give same lights as markers on caboose. Do not think flagman could have got back far from rear end of work train before collision. Saw flagman start back before Beaumont's engine was rounding curve. He was swinging his lantern when Beaumont's engine rounded the curve. From center of curve to point of collision is about seven hundred

feet. Think Beaumont could have seen red light over seven hundred feet ahead of him. Think Beaumont could have stopped' his train within two hundred feet, running twenty-five or thirty miles an hour. * * * Collision was but slight, and did no practical damage. Knocked one pair of trucks off rear car from track. Did not do much damage to Beaumont's engine. I think we made distance between Palmer and Maywood in about time of express freight. We were running pretty lively for a work train. If Beaumont had been on the watch, he would have seen our stop signal as he rounded the curve. As Beaumont's engine approached, my brakeman with the lantern got out of the way by going down on the side of the track. We ran the distance from Palmer to Maywood in little less than ordinary time, taking into account the length and load of our train."

Ramsey, who was rear brakeman on Hall's train, testified as follows: "Got off rear end of work train, when it was running four or five miles an hour, with two lanterns in one hand, when train was slowing up at Maywood. On straight track such lights could be seen three or four train lengths. First thing I saw after getting off and starting back was headlight rounding curve coming at twenty-five or thirty miles an hour. Gave them stop signals. Was back three or four telegraph poles back of where collision occurred. When locomotive approached me, got off of track. * * * Was over ground next morning with local claim agent of defendant. Saw that place of collision was twelve hundred feet from west end of switch at Maywood, forty rail lengths from west end of switch, rails thirty feet long. From point of collision to where headlight could be seen was about seven hundred and fifty feet. I reached a point about four hundred and fifty feet back of work train when I signaled. * * * We made good time ourselves between Palmer and Maywood; pretty lively for work train. Got no instructions to go back and flag. Simply did it. Had two lights,—red and white light. Had no bull's-eye light. They were back at Palmer in caboose. Held both lights in one hand. Such lights could be seen on dark nights. Red light controls white light, if two lights are carried together. Left torpedo on track at Eagle Gorge. We stopped there five minutes. Saw green lights—slow flags—at Maywood. It was a dark and rainy night."

George Blew, the conductor of the train of which Beaumont was engineer, called as a witness upon the part of defendant, said: "Do not remember seeing any signals or slow flags before reaching Maywood. After leaving Eagle Gorge, and when rounding curve at Maywood, saw lights ahead of us on track. Was right on the curve when first saw lights. Could not tell where the lights were, whether on track or train ahead of us, when first saw lights. Was over ground next morning. Rear end of work train, when collision occurred, was about several telegraph poles distant from curve. Beaumont turned on air about same time I saw red light. We had orders for protection against us. Could not tell what time Hall would make from Palmer to Maywood. Talked with Beaumont at Palmer. Was informed at Palmer that Hall had left forty minutes before us. Told Beaumont at Palmer to be careful after leaving Eagle Gorge, as he might find Hall's work train. * * * Could not say we ran faster between Palmer and Maywood than we did at other places. Engineer controls speed of train. Do not remember hearing any whistle from work train or from Beaumont's train when approaching Maywood. Think Beaumont could have stopped within two hundred feet."

Harmon, who was Beaumont's fireman, was introduced on behalf of plaintiff, and testified that "when about half a mile west of the station of Maywood, which is about fifteen and one-half miles east of Palmer, the said James Beaumont suddenly applied the emergency air brakes to his train. At the moment when the air brakes were applied I was putting in a fire; that is, I was putting coal into the fire box of the boiler. As I looked up, I saw a red and white light ahead of us getting down off of the track. Did not notice what became of Beaumont after he applied emergency air brakes, but immediately after said air brakes were applied our train ran into the rear end of a work train. Collision took place about half a mile west of Maywood. * * * Had been on the lookout just before I put in the last fire. Saw no lights, and did not notice any torpedoes on the track. Saw the

lights after Beaumont had applied the emergency air brakes. * * * We were running what I consider carefully. * * * I think we approached and rounded curve at Maywood at about twenty miles an hour."

Riche, a witness on behalf of plaintiff, testified that he had been a freight conductor on defendant's road, and was familiar with the transportation rules of defendant, and with the form of orders issued by defendant for the running of trains. That he would understand No. 10 to mean that it was a freight train that Hall was to protect against. Could not tell from order No. 10 that it was simply an engine and caboose that Beaumont was running. He gave his opinion "that it would not be possible to stop an engine and caboose, running twenty-five or thirty miles an hour, in a distance of two hundred feet. The distance in which it could be stopped would depend upon the condition of the track and the prompt working of the air brakes. If the track was wet and slippery, it would take a longer distance to stop in than if the track was dry."

Did the court err in refusing to submit the case to the jury? Is there any evidence tending to show that the defendant was guilty of any negligence? What was the cause of the collision?

The plaintiff in error, with apparent earnestness, claims that, inasmuch as the witnesses were nearly all in the employ of the defendant, the case ought to have been submitted to the jury, in order to determine whether the testimony given by them was reasonable. The argument seems to be that each witness was endeavoring to exculpate himself, and fasten the blame on somebody else, and that each witness, in these respects, is unworthy of belief. This idea permeates the entire brief. The general tone of the argument of counsel can be best explained by a quotation from their brief:

"The court knows how difficult it is for a plaintiff to get testimony in a case of this kind, where she has to depend upon the statements of persons still in the employ of defendant, who are compelled to give their testimony under the watchful eyes of superior officers and attorneys for the defendant. The court knows that in a case of this kind the testimony of employés called as witnesses for plaintiff should be closely scrutinized, and, if the same is not in accordance with common sense or common experience, such testimony should be rejected."

The testimony, which it is claimed was given in order to fasten the blame on others and thereby exculpate themselves, principally relates to the question whether Hall or Beaumont was guilty of negligence. It is a complete answer upon this point to say that it is wholly immaterial whether the collision was attributable to the negligence of Hall or Beaumont, because they were fellow servants in the employ of defendant, and, if either was guilty of the negligence which caused the collision, the plaintiff could not recover. This principle is too well settled to require discussion or citation of authorities, and is admitted to be correct by plaintiff's counsel. The sole question for our determination is whether the defendant was guilty of any negligence. The only debatable question is whether order No. 10 was so worded as to mislead the conductors and engineers.

It is claimed that order No. 10 violated at least two of defendant's rules—First, by using the word "extra" as applied to Blew's train, which was simply an engine and caboose, while by rule 112 the word "extra" implied that Blew's train was an irregular or extra freight train; second, that said order contained information not essentially

a part of the order, so far as Hall, conductor of the work train, was concerned, thus violating rule 200; that, in addition thereto, the order "that second section No. 53 and Blew extra will meet at Enumclaw" was misleading, and threw Hall off his guard as to his duty to protect against Blew extra east, as he ought and probably "would have done had he not been misled by this order." The witness Riche in his testimony said: "I would understand order No. 10 to mean that it was a freight train that Hall was to protect against. Could not tell from order No. 10 that it was simply an engine and caboose that Beaumont was running. It is customary and usual for an engine and caboose out on the road to run much faster than a freight train." The question is not whether order No. 10 might be considered by others as misleading, but whether, as a matter of fact, either Hall or Beaumont was misled thereby. If they understood it as intended by the train dispatcher, it makes no difference what other interpretation might have been given to it by outside parties. W. C. Albee, the train master, testified that he thought it best to give an order "in the way that train order No. 10 was given. Beaumont had run extras and work trains." How did Hall and Beaumont interpret the order? Would it have made any difference in the result, or in any manner have prevented the collision, if Beaumont's train had been designated as consisting of an engine and caboose instead of "extra"? Beaumont is dead, and his understanding must be gleaned from his acts, and from his general knowledge, which he is shown to have had. He certainly knew of what his train consisted. There is no evidence whatever which tends in any manner to prove that he was misled by order No. 10.

We have heretofore quoted some of the testimony of Conductor Hall with reference to order No. 10. He further testified as follows:

"Under the rules and practice of the company for the dispatching of trains, Beaumont's train would be called an 'extra.' There are only three classes of irregular trains: First, a special, which is an irregular passenger train; second, an extra; third, a work train. The term 'extra' includes all classes of irregular trains except specials and work trains. Question by the Court: If you had actually known that the train behind you—this train that Beaumont was on that collided with you—was made up of a locomotive and caboose, would you have taken any different precaution or made any further effort to avoid a collision than you did make? A. No, sir; I would not."

This testimony conclusively shows that Hall was not misled by order No. 10. The record, in our opinion, shows that Beaumont did not exercise usual care and caution in sooner stopping his train when he saw, or should have seen, the lights in the rear end of Hall's train, and the signals given by Ramsey, a brakeman on Hall's train. The testimony also shows that Beaumont disobeyed order No. 37 given to him at South Prairie, which is a registering station, directing him to run slowly and carefully "at Maywood." Moreover, rule 149 limits the speed of a freight train to one mile in three minutes. The speed he made with his train was far in excess of this limit. Having violated this rule relative to speed, and disobeyed the orders of defendant, he must, under the principles announced in Railroad Co. v. Poirier, 167 U. S. 47, 17 Sup. Ct. 741, 42 L. Ed. 72, be held guilty of negligence.

We are of opinion, upon a careful review of the whole evidence, that it was Beaumont's negligence that caused the collision. The case may be, as claimed by counsel, a hard one for plaintiff; but it is made absolutely clear that plaintiff, under the law, upon the undisputed facts, is not entitled to recover any damages. It therefore necessarily follows that the court did not err in instructing the jury to find a verdict for defendant. The judgment of the circuit court is affirmed.